**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACIE GARDNER** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-3422** |
| | : | |
| **ULTA SALON, COSMETICS** | : | |
| **& FRAGRANCE, INC.** | : | |

---

**McHUGH, J.**                                                                                  **August 24, 2022**

**MEMORANDUM**

This matter involves claims of age and disability discrimination, brought by a former sales

manager at Ulta Salon Cosmetics and Fragrance, Inc., whose employment was terminated at age

57.  The stated basis for her termination was violation of company policy.  Having reviewed the

record, Plaintiff's allegation that she was terminated because she suffers from depression and

anxiety fails because the decision-makers responsible for her termination did not have knowledge

about her medical condition.  Plaintiff's claim of age discrimination is similarly deficient, because

she cannot identify comparators that received better treatment based on age nor point to specific

instances of age discrimination.  Plaintiff further argues that a similarly situated non-disabled,

younger employee was not terminated for violating company policy, but no reasonable juror would

disbelieve the Company's non-discriminatory reasons for treating the two employees differently.

I am therefore compelled to grant  Defendant's motion for summary judgment.

**I.     Factual and Procedural Background**

*A. Ms. Gardner's Hiring at Ulta and the Company Structure*

Tracie Gardner began working at Ulta Salon Cosmetics and Fragrance, Inc. (Ulta) on

October 11, 2016, when she was 53 years old.  Statement of Undisputed Material Facts (SUMF)

¶¶ 6-7, ECF 21-2; Pl.'s Dep. at 23:9-11, 44:1-8, Ex. 2 to Mot. Summ. J, ECF 21-4.[1]  She was hired

to serve as the Prestige Sales Manager in the Newtown Square, Pennsylvania store, responsible for

assisting in day-to-day operations, running sales and events and supervising and training associates

within Ulta's high-end sales department.  SUMF ¶¶9-10, 16; Pl.'s Dep. at 35:2-36:10, 67:23-68:20,

104:21-105:2; Orosz Decl. at ¶ 4, Ex.1 to Mot. Summ. J., ECF 21-3.  Ms. Gardner understood that

a condition of her employment required that she follow the company's rules and policies, which

were available to her throughout her employment on Ulta's internet called ULTAnet. SUMF

¶¶11,12; Pl.'s Dep. at 43:3-24, 52:1-54:18.  The policies required that Ms. Gardner be "responsible

for being knowledgeable of Ulta's policies and enforcing them" and be "responsible for protecting

the company's assets and minimizing loss." Pl.'s Dep. at 82:2-11; Prestige Sales Manager Job

Description, Ex. 8 to Mot. Summ. J, ECF 21-10.

In her role as the Prestige Sales Manager, Ms. Gardner reported to Newton Square store's

General Manager. SUMF ¶ 17; Pl.'s Dep. at 50:10-13, 79:11-24.[2]  Throughout Ms. Gardner's

employment, different individuals filled the General Manager role. Pl.'s Dep. at 50:1-18, 51:4-14,

82:24-83:4, 83:19-84:3.  From December 2019 through February 2020, the Newton Square store

did not have a general manager.  Ariel Oswold, the Acting General Manager, regularly visited the

store and provided management support.  SUMP at ¶21; Orosz Decl. at ¶ 12; Jones Dep. at 16:8-

15, Ex. 9 to Mot. Summ. J., ECF 21-11.  Ms. Gardner and Ms. Oswald had previously worked

---

[1] Attorney for Plaintiff and Attorney for Defendant filed a Statement of Undisputed Material Facts (SUMP) in compliance with the Court's Guidelines for Counsel. *See* ECF 21-2.  The page numbers referenced with respect to depositions reflect the deposition page numbers and not the ECF stamped page numbers.

[2] Ms. Gardner reports that when a general manager was present, she reported to the general manager, however, there were different general managers throughout her employment at Ulta. When there was a vacamcy in the general manager position, Ms. Gardner testified that she reported to the district manager. Pl.'s Dep. at 79:11-24.

together as co-workers when the Newtown Square store first opened in 2016.  According to Ms. Gardner, the pair got along "fine" at that time. Pl.'s Dep. at 147:20-149:15.  Ms. Oswald officially became the full-time General Manger of Ulta's Newtown Square store on February 2, 2020. Pl.'s Dep. at 149:23-150:11, 209:12-18; Orosz Decl. at ¶ 14.

> B.  *Ms. Gardner's Leave of Absence and Requested Leave of Absence from Work*

In 2018, Ms. Gardner requested and was approved for intermittent leave under the Family and Medical Leave Act ("FMLA") for purposes of caring for her son. Ms. Gardner was able to take intermittent leave, as needed. Pl.'s Dep. at 103:1-104:3, 133:19-135:8.  On February 12, 2020, Ms. Gardner requested a leave of absence to begin March 1, 2020, through Ulta's third-party leave administrator, UNUM, due to depression and anxiety.  Pl.'s Dep. at 223:17-224:23; Ex. 15 to Mot. Summ, J, at P000276, ECF 21-17. Ms. Gardner and her physician anticipated a return-to-work date of March 19, 2020. Pl.'s Dep. at 229:17-230:3; Ex. 15 at P000265. Ms. Gardner does not recall sharing her medical condition or the reason for her leave request with Ms. Oswald.  Pl.'s Dep. at 209:12-210:3, 215:9-216:10.

> C.  *Gratis Incident*

Ulta maintains that the company terminated Ms. Gardner after an incident in which she violated a policy regarding the distribution of complimentary products known as "gratis."  "Gratis" are complimentary products provided to Ulta by its brand partners for potential distribution to associates after an associate has completed certain prerequisites.  Pl's Dep. at 57:20-58:11; "Vendor Gratis and Gifts," Ex. 4, ECF 21-6; Jackson Dep. at 17:15-22, Ex. 5 to Pl.'s Mot. Summ. J, ECF 21-7, Orosz Decl. at ¶¶ 5-7.  Ulta's gratis policy states as follows: "Gratis brought into store by a brand partner must be given to the general manager for distribution. The general manager (or other member of store management with the general manager's permission) is the only

authorized individuals to provide gratis to associates." *See* "Vendor Gratis and Gifts;" Jackson

Dep. at 17:4-18:4, 41:3-25.

In January 2020, Ariel Oswald, the Acting General Manager of the Newtown Square store,

noticed that gratis were missing from the store and contacted Area Loss Prevention Manager Craig

Jackson. Jackson Dep. 35:21-25. Jackson was tasked with reviewing security camera footage of

the Newtown Square store, Jackson Dep. at 37:10-19; Footage, Ex. 13, ECF 21-15.  The security

footage showed "gratis going into the office, and then it showed gratis coming out of the office

from—by Tracie Gardner."[3] Jackson Dep. 37:17-19. After reviewing the security camera footage,

Mr. Jackson scheduled an interview with Ms. Gardner.  SUMP ¶32; Jackson Dep. at 46:16-20.  On

February 18, 2020, Mr. Jackson emailed Associate Relations Specialist Emma Leliefeld, District

Manager ("DM") Tammy Orosz, and his supervisor, Regional Loss Prevention Manager Misty

Davis, and informed them that he planned to interview Ms. Gardner that evening for a possible

gratis policy violation. Jackson Dep. at 12:16-22, 32:13-21, 56:8-17; Ex. 16 at p. 2; Orosz Decl. at

¶ 20.  Mr. Jackson asked Ms. Leliefeld if he had permission to suspend Ms. Gardner if she admitted

to violating the gratis policy during her interview, and Ms. Leliefeld confirmed that she supported

suspension under those circumstances. SUMP ¶ 31; Jackson Dep. at 56:8-17; Email

Communication, Ex. 16 to Mot. Summ. J. at 1-2, ECF 21-18.  On February 18, 2020, Mr. Jackson

asked Ms. Gardner if she was willing to meet for an interview, and Ms. Gardner agreed.  Pl.'s Dep.

at 178:9-179:13, 181:11-15; ULTA000067, Ex. 14.[4]  During the interview which took place on

---

[3] Jackson testified that he knew that gratis was being brought into the office because upon watching the video, he recognized the box that holds the gratis.  Jackson Dep. 37:20-23.  He did not specifically see gratis coming out of the office but he saw Tracie Gardner coming out of the office with bags, which he inferred contained gratis, because "[w]hat else would come out of the office?" Jackson Dep. 39:14-22.

[4] Ms. Oswald sat in on Mr. Jackson's interview of Ms. Gardner but remained silent during the interview. Pl.'s Dep. at 181:7-15, 184:16-21; Jackson Dep. at 62:7-13. 34.

February 18, 2020, Mr. Jackson and Ms. Gardner reviewed the gratis policy, as well as "the bagging up of gratis" that occurred on January 17, 2020.  Pl.'s Dep. at 182:17-183:6.  According to Mr. Jackson, during his interview with Ms. Gardner, she confirmed that "she was a hundred percent aware of" the gratis policy which provided that only General Managers could distribute the gratis, and she admitted to "giving gratis out" because "there was no general manager [at the store]."[5] Jackson Dep. at 47:2-7, 48:24-49:11.

 At the conclusion of Ms. Gardner's interview with loss prevention, she wrote and signed a statement. Pl.'s Dep. at 183:16-184:9; Ex. 14 at ULTA-000068; Jackson Dep. at 51:1- 8. 36. The statement included:

> I Tracie Gardner PSM at Store 1247 recall receiving from shipment [sic] a box of Gratis for training purposes. Separating and bagging the gratis and leaving the bagged gratis in the office. Some gratis was labeled with employees names who had taken or upon completing training could receive their gratis. I also received my gratis. This took place between General Manager's [sic]. There was not a general manager working at my store location at the time to provide me with my gratis which is company policy. Pl.'s Dep. at 185:7-21; ULTA-000068.

Ms. Gardner contends  that during this meeting, Mr. Jackson "pressured [her] to say what he wanted to hear" and [a]fter [she] finished writing a statement and gave it to him, he continued to pressure [her] until [she] added additional statements that he wanted [her] to include." Gardner Decl. ¶3, Ex. 3 to Resp. Opp. Summ. J., ECF 24-3.  Moreover, he "looked at what [she] had written and gave it back to [her] to change, at one point screaming at [her] saying, 'but you didn't say you did anything wrong,'" which caused her to feel "uncomfortable, pressured, and nervous during the entire meeting."  *Id.*  Mr. Jackson maintains that he "told [Ms. Gardner] to include the facts of what she did" but did not ask her to add anything additional to her statement.  Jackson Dep. at

---

[5] Mr. Jackson reported that Ms. Gardner admitted that she did not call a district manager to ask for permission to distribute the gratis. Ms. Gardner also informed Mr. Jackson that she had previously given out gratis in the absence of a general manager because "nobody else was here to give it out." Jackson Dep. 49:9-24.

52:2-8.  Mr. Jackson suspended Ms. Gardner at the conclusion of the interview. Jackson Dep. at

51:1-8, 52:12-14. 38.

After interviewing Ms. Gardner, Mr. Jackson emailed Ms. Leliefeld, Ms. Orosz, and Ms.

Davis, attaching a copy of Ms. Gardner's statement and advising as follows:

> During our conversation Gardner admitted being 100% knowledgeable of the
> Gratis Policy and took Gratis and set up Gratis Bags in the office for other
> employees on 1/17. Gardner was aware that only the GM could issue Gratis to
> employees who completed their DMT Trainings. The stores training completion
> percentage for week 50 was 45%, Gardner took Gratis for herself on the 17th during
> week 50 and did not complete any trainings. Gardner knew what she did was wrong
> but tried to blame her decision to take Gratis on the store being without a GM. I did
> explain to her that she could've partnered with her DM prior to her taking the Gratis.
> I recommend Termination.

SUMP ¶38; Jackson Dep. at 32:22-25, 55:22-56:7, 56:18-24, 59:22-61:7; Ex. 16 at p. 1; Orosz

Decl. at ¶¶ 20- 23. 39.  At the time that Mr. Jackson made his recommendation that Ms. Gardner

be terminated, he had no knowledge of her personnel or employment history. SUMP ¶40; Jackson

Dep. at 30:11-31:8.

After consulting with Mr. Jackson and reviewing Ms. Gardner's written statement from

her interview, Orosz consulted with Ms. Leliefeld who agreed that Ms. Gardner should be

terminated.  Orosz Decl. at ¶ 23.  On February 18, 2020, Orosz "made the decision to terminate

Ms. Gardner's employment due to her knowing violation of the gratis policy." *Id.* at ¶ 25.  Ms.

Gardner was 57 years old when she was terminated. SUMP ¶39; Pl.'s Dep. at 23:9-11, 178:13-15.

40.

Ms. Gardner maintains that she distributed the gratis to employees because of the absence

of a general manager at the store. The existence of such a practice  was supported by the testimony

of some of her former colleagues.  For instance, Darrell Fuller, who was employed by Ulta as a

General Manager/Business Market Trainer until November 2019, recalls that Ulta's policy was

that "gratis had to be given out by the actual general manager" but notes that on occasion, the Newtown Square store did not have a General Manager assigned to it.[6]  Fuller Dep. 7:17-20, 10:13-16, 11:3-7, Ex A. in App. to Resp. Opp. Summ. J., ECF 25.[7]  Mr. Fuller stated that when "no GM in place, you could either partner with loss prevention; or maybe you were the next senior role in the building" responsible for handling the gratis when associates needed to receive the items. *Id.* at 11:12-12:7.  He recalls that in these instances, Ms. Gardner handled gratis, *id.* at 12:23-13:3, and although he does not know whether it was acceptable to the company to deviate from the written policy, he believes that Ms. Gardner made the decision to distribute the gratis because "it was... the best business decision to make for the store, for the staff" to ensure employees received the gratis, *id.* at 14:7-20.  He does not recall anyone complaining about Ms. Gardner's handling of gratis, including the district manager.  *Id.* at 16-6:23.

Another former employee, Irene James, who worked as the salon manager at the Newtown County store from November 2017 until October 31, 2021, similarly testified that because there was often not a general manager present at the store, the gratis was handled by other managers in the building including the prestige manager, the retail sales manager, and the service manager. James Dep. at 10:3-13, 19:1-24, Ex. B in App. to Resp. Opp. Summ. J., ECF 25.  She does not recall the district manager or the loss prevention staff previously complaining about the handling of gratis when there was no general manager present.[8]  *Id.* at 21:10-22:6, 22:16-23:6.

---

[6] Another former employee, Vanessa Jones, who worked at the Newtown Square store from March 2018 until June 2020, confirms that there was a period of months in which the store did not have a general manager.  Jones Dep. at 12:3-14-10, 16:23-17:3, Ex. C in App. to Resp. Opp. Summ. J., ECF 25.

[7] The appendix was submitted one day after the response in opposition to the summary judgment motion but I nonetheless consider the appendix.  *See* App., ECF 25.

[8] James did not know whether the district manager knew about how gratis was being handled, although she "would assume [the district manager] would [know about the handling of gratis], because she knew that [the store] did not have a general manager, and she knew gratis boxes were coming in once a month." She

A third former employee, Retail Sales Manager Vanessa Jones, reports that two different General Managers gave Ms. Gardner the responsibility of handling the gratis, Jones Dep. at 18:17-19:15, and she is not aware that any district managers complained about this, *id.* at 19:22-20:3.  In or around January or February 2020, Jones was asked to meet with loss prevention staff including Mr. Jackson and Ms. Oswald about the Newton Square store's gratis practices.  *Id.* at 20:13-21:7. Jones explained that Ms. Gardner "had always handled [gratis]" and when the loss prevention staff explained that the General Manager was supposed to handle the gratis, Jones explained that the "GMs...had been fully aware and even participated in having Tracie [Gardner] distribute" the gratis, so she was "not aware that any wrongdoing had been done by anybody regarding gratis."[9] *Id.* at 21:8-14.

### D.  Gratis Violation Committed by Another Employee

Ms. Gardner is not the only employee who committed a gratis violation.  In February 2020, Area Loss Prevention Manager Jackson investigated a second violation at Newtown Square by employee Vanessa Jones, who was 22 years old at the time.  Orosz Decl. at ¶¶ 28-30.  During an interview between Jackson and Jones, Ms. Jones wrote a statement, indicating that she believed Ms. Gardner had permission or authorization to distribute gratis, and that she took gratis from Ms. Gardner in January 2020."  *Id.* at ¶ 31, Ex. 2 to Orosz Decl. ECF 21-3.[10] Jackson recommended

---

assumes that the loss prevention department did not know that other managers were handling gratis when the general manager was not present but notes that the loss prevention manager "could see on the cameras what was happening."  James Dep. at 21:22-23:6.

[9] The Gratis Policy states that a general manager may authorize individuals to provide gratis to associates. "Gratis brought into store by a brand partner must be given to the general manager for distribution. The general manager (or other member of store management with the general manager's permission) is the only authorized individuals (sic) to provide gratis to associates. Ex. D in App. to Resp. Opp. Summ. J., ECF 25.

[10] The statement reads, in part, "On January 17th Tracie sectioned some gratis for the team and gav[e] me and I took mine home. I did not know this was against policy. I had asked Ariel when we received a box of gratis if Tracie was going to distribute it. She then told me a GM had to approve it." Ex. 2 to Orosz Decl.

that Jones receive a "final written warning" because although she admitted to taking gratis that was distributed by Ms. Gardner, Jones "admitted that she was not aware of the policy [requiring a general manager to distribute gratis or authorize another employee to distribute the gratis]."[11]

### E.  The Lawsuit

Following her termination, Ms. Gardner filed suit against Ulta Beauty Inc.  *See* Compl., ECF 1.  She brings claims for discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, as well claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and claims for age and disability discrimination under the Pennsylvania Human Relations Act (PHRA)., 43 PA. STAT. §§ 951 *et seq.* Compl. ¶¶ 27-38.

## II.      Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.     Discussion

### A.  Disability Discrimination Claims

To establish a *prima facie* case of discrimination under the ADA, a Plaintiff must demonstrate that "(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville School. Dist*., 184 F.3d 296, 306 (3d Cir. 1999).  *See also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (applying ADA analysis to PHRA).  If a

---

[11] Like Gardner, Ms. Jones had signed an employee handbook acknowledgement form and the handbook contained information about the gratis policy.  Ex. 2 to Orosz Decl.

plaintiff can make out a *prima facie* case, she must show that the company's legitimate, non-discriminatory reason for her discharge is mere pretext for discrimination.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 1999) (quoting *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).

Defendant does not concede that Ms. Gardner suffers from a disability, as defined by the ADA and PHRA, but argues that even if she did have a disability, she still cannot make out a *prima facie* case of disability discrimination due to a lack of causation. Mot. Summ. J. at 15. I reject Defendant's first argument because I conclude that there is a genuine issue of material fact as to whether Gardner was disabled.  I will nonetheless grant summary judgment because a reasonable juror could not conclude that Plaintiff was fired due to her disability.

The ADA defines "disability" to include "(A) a physical or mental impairment that substantially limits one of more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  When determining whether an individual has a substantial impairment, courts conduct an individualized analysis and examine whether the plaintiff is limited in performing "a major life activity as compared to most people in the general population."  29 C.F.R. §§ 1630.2(j)(1)(iv); (ii).  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

Plaintiffs' medical records raise a genuine dispute of material fact as to whether she was disabled at the time of her termination. Her medical records indicate that she has anxiety and depression and "trouble seeing through her work day due to symptoms."  Ex 15 to Pl.'s Mot. Summ. J. at P000264, ECF 21-17.  The physician observed that Ms. Gardner was "tearful" during

the examination and provided her with a prescription. *Id.* Moreover, she was granted a leave of more than two weeks due to her "serious health condition." *Id.* at P000276. The ADA's regulations make clear that "'[s]ubstantially limits' is not meant to be a demanding standard." 29 C.F.R. §§ 1630.2(j)(1)(i). In light of these records, questions of material fact exist as to whether Ms. Gardner was disabled.

Assuming Ms. Gardner was disabled at the time of her termination, she has failed to demonstrate a causal connection between her termination and her alleged disability. The only evidence that could raise an inference of discrimination is that Ms. Gardner was terminated on or around February 18, 2020, just days after she had requested a leave of absence to begin on March 1, 2020 due to her depression and anxiety. But there is little in the way of evidence in the record indicating that the staff involved in making the termination decision had knowledge of her disability or the specific reason for her leave. *See Jones v. UPS*, 214 F.3d 402, 406) (3d Cir. 2000) ("It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability"). *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) ("to establish discrimination because of a disability, an employer must know of the disability."). As both parties agree, Mr. Jackson, the employee who recommended her termination, had no knowledge of Ms. Gardner's employment history when investigating the gratis violation and making his recommendation for termination. SUMP ¶ 40, Jackson Dep. at 30:11-31:8. Moreover, during her deposition, Ms. Gardner did not point to any evidence indicating that the other individuals involved in making the termination decision, Ms. Orosz or Ms. Leliefeld, knew that she had a disability when terminating her employment.[12] And Ms. Orosz specifically stated that

---

[12] When asked, "Do you know for certain what information, if any, was shared with your management team about the reasons for your leave?" M. Gardner responded, "I don't know at this time... I'm not sure who [knew the reasons for my leave]... The salon manager may have known. There might have been a few managers. I can't really recall at this time." Gardner Decl. 208:18-209:10.

she was not, and is not, aware of the specific reasons why Ms. Gardner requested a leave of absence

on February 12, 2020, nor was she aware that Ms. Gardner had any health conditions. Gardner

Decl. ¶ 19.  Without evidence that the decision-makers knew that Ms. Gardner was struggling with

depression and mental health challenges, a reasonable juror could not conclude that she was

terminated because of her disability.[13]

Plaintiff theorizes that she must have been terminated because of her disability because

another non-disabled employee, Vanessa Jones, also violated the gratis policy but was not

---

When asked whether she ever discussed her mental health struggles with Ms. Oswold, Ms. Gardner specifically testified "I'm not sure if I did [share having mental health struggles with Ariel Oswold]. You have to understand, that window of time with Ariel is very small. She was just coming in February 2 or something like that, I think, don't hold me to that either, I have to look at the timeline, the dates... Ariel may not have even been aware yet." Gardner Dep. 209:12-210:2.

Plaintiff points to the  declaration that she submitted after she was deposed, in which she stated that she had in fact told Ms. Oswold about her medical concerns including her diagnosis of depression. Pl.'s Sur-reply at 2, ECF 27.  In her declaration, Ms. Gardner stated, "[o]n Ms. Oswald's first official day as General Manager, Sunday, February 2, 2020, I had a conversation with her concerning my medical concerns, my diagnosis of depression, the situation with my son resulting from the recent passing of my husband, and my need to take some time off from work to manage my affairs. I told her about an upcoming medical appointment that was scheduled for February 6..." Decl. ¶ 1.  Ms. Gardner argues that the declaration must be considered, and moreover, that it does not contradict the Parties Stipulated Statement of Undisputed Material Facts, in which the parties stipulated that "Ms. Gardner does not recall sharing her medical condition or her reason for her leave with Ms. Oswold" SUMP. ¶ 29. She claims there is no inconsistency because the parties did not stipulate that she "*did not share* her medical condition" but instead stipulated only "that she *did not recall* doing so."  Pl.'s Sur-reply at 2 (emphasis in original).

I conclude that this declaration conflicts with Ms. Gardner's prior testimony. Not only did Ms. Gardner state during her deposition that she did not recall telling Ms. Oswold about her medical conditions, but she re-affirmed this in the Statement of Undisputed Material Facts, filed roughly three months later. This declaration, submitted in response to the motion for summary judgment, well after both her prior testimony and stipulated facts, does not create a genuine issue of material fact sufficient to defeat the motion for summary judgment, as she offers no satisfactory explanatory for this after-the-fact contradiction of her prior sworn testimony. *See Martin v. Merrell Dow Pharmaceuticals*, 851 F.2d 703, 706 (3d Cir. 1988) (noting that, absent a satisfactory explanation, a contradictory subsequent affidavit does not create a genuine issue of material fact).

[13] Defendants correctly note that Ms. Gardner has failed to point to any instances during her employment in which Ulta employees made negative or disparaging comments regarding her alleged disabilities or her request for leave.  Defendants further note that when Ms. Gardner previously sought intermittent FMLA leave in 2018 due to her son's medical condition, Plaintiff admits that  Ms. Orosz helped her make the request for leave.  Mot. Summ. J. at 16 citing Pl.'s Dep. at 134:13-23.

terminated.  Resp. Opp. Summ. J. at 10.  But  Gardner cannot show that she and Ms. Jones were

"similarly situated" employees.  *See Mandel v. M & Q Packaging Corp*., 706 F.3d 157, 170 (3d

Cir. 2013) (reasoning that an inference of discrimination is not raised where the employees to

which Plaintiff compared herself were not similarly situated individuals outside of the protected

class).  Although Gardner and Jones held similar positions, Retail Sales Manager and Prestige

Sales Manager, and in that sense were "similarly situated," they engaged in somewhat different

conduct *and* there were differentiating or mitigating circumstances that distinguished their

employer's treatment of them.  *See McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d. Cir.

2011) (nonprecedential) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir.

2000) (overruled on other grounds) (reasoning that relevant factors to determine whether

employees are similarly situated includes that the "two employees dealt with the same supervisor,

were subject to the same standards, and had engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish their conduct or the employer's

treatment of them.").  Although both Gardner and Jones violated the gratis policy, Gardner

admitted to distributing gratis to employees with knowledge that she was violating the company

policy, whereas Jones claimed ignorance of the policy.[14]  In fact, Jones reported that she did not

---

[14] In her response to the Motion for Summary Judgment, Plaintiff argues that "the evidence developed
during discovery has revealed disputes of fact concerning whether Ms. Gardner actually violated
defendant's gratis policy.  First, Mr. Jackson admitted during his deposition that the video footage did not
show that Ms. Gardner put gratis in the plastic bags at issue, nor did it show what was actually in the bags.
Second, Mr. Jackson claims that Ms. Gardner admitted that she violated the gratis policy. That assertion is
not true.  To the contrary, when Mr. Jackson met with Ms. Gardner, he pressured her to add statements to
her written statement, even to the point of screaming at her that 'you didn't say you did anything wrong.'
See Gardner Dec. at ¶ 3. Third, the policy expressly authorized her to handle the distribution of gratis if
permitted by a general manager. Fourth, on the day in question, January 17, 2020, there was no general
manager at the store, and Ms. Gardner simply followed the practice she had done many times before." Resp.
Opp. Summ. J. at 11-12.

This response is unconvincing.  As an initial matter, it does not matter that Mr. Jackson admitted that the
video footage did not show that Ms. Gardner putting gratis in plastic bags, as Ms. Gardner admitted to
taking and distributing the gratis. Second, even if Mr. Jackson pressured Ms. Gardner to add additional

know that she was violating company policy when accepting gratis because in the past, prior General Managers had allowed Ms. Gardner to handle gratis distribution.[15] Jones Dep. 18:17-23. And Mr. Jackson testified that where an employee admits to *knowingly* violating a loss prevention policy, he recommends termination.[16] Moreover, their degree of culpability is different: Ms. Gardner took a box of gratis from an Ulta office, whereas Jones accepted one bag. In light of this, Ms. Gardner has not identified a non-disabled employee who is similarly situated to her, and a reasonable juror could not reach an inference of discrimination.

Because Ms. Gardner has not established a *prima facie* case of disability discrimination, I need not analyze whether Ulta met its burden of articulating a non-discriminatory reason for Ms. Gardner's discharge nor whether Ulta's reason as mere pretext for disability discrimination.

B. *Age Discrimination Claims*

Under the ADEA, an employer may not "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

---

statements to her written statement, a fact that Mr. Jackson disputes and that Ms. Gardner did not mention during her deposition testimony, Ms. Gardner still has not alleged that she was unaware that she was violating company policy when she distributed the gratis. Third, even if the policy expressly authorized her to handle the distribution of gratis if permitted by a general manager, on the day in question, she had not received that permission from a general manager.

[15] Plaintiff states that "Ms. Jones herself testified that she expressly told Mr. Jackson that she participated in the distribution of gratis herself" and cites to page 19 of Ms. Jones' deposition testimony. Resp. Opp. Summ. J at 10. Plaintiff has either miscited the page number or misread the record. There is no reference on page 19 to Ms. Jones admitting that she distributed gratis. On page 18, she is asked "[d]uring the period of time when you did not have the GM, did your responsibilities include dealing with what's known as gratis?" to which she responded, "Not me particularly, but I would say—not me particularly that wasn't my responsibility usually, that was something that Tracie [Gardner] would handle." Jones Dep. 18:4-11.

[16] Mr. Jackson responded to a series of questions during his deposition. Q: So, regardless of what the policy was, if the employee knowingly violated it, your recommendation was always termination; is that correct? A. If they knowingly violate it, yes... Q. Why? A. Because the employee was a hundred percent aware of the policy, and they knowingly violated the policy. Jackson Dep. at 23:10-17; 24:5-25:7.

To show a prima facie case of age discrimination under the ADEA and the PHRA, the plaintiff must show that she is (1) at least forty years old; (2) that she suffered an adverse employment action; (3) that she was qualified for her position; and (4) that she was "ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). *See also Kelly*, 94 F.3d at 105 (applying ADEA standard to PHRA claims). Plaintiff has demonstrated the first three elements of her *prima facie* case. With respect to the fourth factor, Plaintiff claims that she was replaced by another employee who was sufficiently younger than her, Resp. Opp. Summ. J. at 11, but points to no evidence in the record to substantiate this claim. Nor is there any reference to this in the Statement of Undisputed Material Facts.[17] There is apparently no evidence to establish that Ms. Gardner was replaced by someone sufficiently younger than her.[18]

But even if she were not directly replaced, the fourth element of a *prima facie* case may be satisfied by providing evidence that raises an inference of age-based discrimination. *See Willis*, 808 F.3d at 644-45. A Plaintiff's own belief, without supporting evidence, is insufficient to establish an inference of discrimination. *Id.* at 645-46. Ms. Gardner argues that Ulta discriminated against her on the basis of age as evidenced by the fact that younger employees were encouraged to apply to her position before she was officially terminated. However, when asked to substantiate this allegation, Ms. Gardner answered, "Well, that was hearsay. I don't know who

---

[17] In her declaration, Ms. Gardner states that prior to terminating her, Ms. Oswald told Amber Murray, an employee younger than 40, to apply for the position of Prestige Service Manager at the Newtown County store, and before her termination, Ms. Oswald offered Ms. Gardner's position to two employees younger than 40." Gardner Decl. ¶ 5.

[18] There is a reference in Ms. Gardner's deposition to the fact that a woman named Jocelyn was transferred from a different store to Ms. Gardner's store to fill the Prestige Sales Manager Role after Ms. Gardner was terminated, although the roles at Ulta may have changed by that point. Regardless,   Jocelyn's age is not referenced in this section of the deposition testimony. Pl.'s Dep. at 201:2-20.

really told me that [an employee named Jocelyn had been encouraged to apply for the PSM position], but I did become aware of that."[19]  Pl.'s Dep. at 192:23-193:4.  When asked how she learned that Amber, a younger employee had been encouraged to apply to her position, she reported that Amber told her that she had been encouraged to apply, but could not recall the details of this conversation,[20] *see id.* at 193;7-13, and when asked about another employee that had allegedly been encouraged to apply to the position, she responded, "I can't remember." *Id.* at 196:18-21. Moreover, when asked to point to other evidence that supported her claim of age discrimination, she reported that the individuals at the store were "a lot younger than [her].... it seemed like they were trying to rebuild with younger people in mind, not someone like myself." *Id.* at 198:2-8.  And although Ms. Gardner "fe[lt] like [she] was treated differently" because she was one of the oldest employees, she cannot point to specific examples to substantiate this feeling. *Id.* at 203:1-2.   Without evidence of age-related remarks or favorable treatment of younger comparators for reasons of age, Plaintiff has failed to raise an inference of discrimination and Defendant would be entitled to summary judgment as a matter of law.[21] *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (stating that "conjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment").

---

[19] *See* S*telwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d at 1275 n. 17 (3d Cir. 1995) (For purposes of summary judgment, a court may only consider hearsay statements that would be capable of admission at trial.)

[20] Plaintiff produced a text message from Amber in which she wrote, "Ariel told me the position is open and I can apply for it. But I don't want it if there was anything shady going on." Pl.'s Dep. 193:19-194:5. This suggests that a younger employee was encouraged to apply *after* Ms. Gardner was terminated from the position, but does not support a preconceived plan by Ulta to replace Plaintiff with someone younger.

[21] To the extent that Ms. Gardner points to the favorable treatment of Ms. Jones, the younger employee who also violated the gratis policy, this claim fails for the reasons discussed previously: that Ulta provided a legitimate reason for the differences in their punishment, i.e. that Jones did not commit a knowing violation of the gratis policy.

Even assuming that Plaintiff could establish a *prima facie* case of age discrimination, a reasonable jury could not find that Defendant's proffered reasons for her termination were pretextual.  Once a plaintiff establishes a *prima facie* case, Defendant must answer with legitimate, nondiscriminatory reasons for its action.  *See Fuentes*, 32 F.3d at 764; *Simpson*, 142 F.3d at 644 (applying pretext analysis to ADEA claims).  Once Defendant meets this "relatively light burden," the burden of production shifts back to the plaintiff who must show that each of the employer's reasons are pretextual.  *Fuentes*, 32 F.3d at 763.  To demonstrate pretext and defeat summary judgment, the plaintiff must then identify evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Id.* at 764.

Defendant has answered with legitimate, nondiscriminatory reasons for its action: Ms. Gardner was terminated because she knowingly violated the gratis policy.  Even when the facts of the case are viewed in the light most favorable to the Plaintiff, there is ample evidence in the record from which a factfinder could believe Defendant's articulated reasons, including Mr. Jackson's testimony that he terminates an employee when she knowingly violates company policies, and the existence of company policies prohibiting those who are not General Managers from distributing gratis without the explicit approval of a General Manager.

Plaintiff points to the testimony of former Ulta employees that Prestige Sales Managers and other employees regularly distributed gratis at the Newtown County store to undermine Defendant's articulated reason for Ms. Gardner's termination.  The testimony from fellow Ulta employees such as Darrell Fuller, Irene James, and Vanessa Jones certainly reflects that without a General Manager regularly present at the Newtown County store, there was a practice in which

other employees, including the Prestige Sales Manager, handled the distribution of gratis. Moreover, the testimony from fellow employees makes clear that even when General Managers were present, it was a common practice to outsource the role of distributing gratis to other employees, including the Prestige Sales Manager.  It is less clear to what degree that may have been explicitly authorized. Nonetheless, whether Ms. Gardner should have been terminated for violating the gratis policy is not the issue, so long as the reason for her termination was not discriminatory.[22] "To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ." *Id*. at 765.  Rather, the plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Keller v. Orix Credit Alliance, Inc*., 130 F.3d 1101, 1109 (3d Cir. 1997). Stated differently, Plaintiff must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).  Plaintiff has failed to identify such weaknesses or inconsistencies in Defendant's proffered reasons given her knowing violation of company policy.

Finally, to the extent that Ms. Gardner seeks to show pretext by pointing to the different disciplinary treatment of Ms. Jones, this claim fails because the employer had an articulated reason for the discrepancy.  Moreover, the Court of Appeals has cautioned against "selectively choos[ing]

---

[22] In her sur-reply, Plaintiff argues that at the very least, she has demonstrated that there are facts in dispute concerning whether defendant had a practice of permitting Prestige Sales Managers to distribute gratis without the approval of a general manager. Pl.'s Sur-reply at 3. Although these facts may be in dispute, these facts are not material so long as the employer's reason for termination was not discriminatory.  Plaintiff cannot point to any evidence that the termination was discriminatory.

a comparator," holding (in the age discrimination context) that a "decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645-46 (3d Cir. 1998). In conclusion, Plaintiff has failed to point to record evidence from which a reasonable jury could find that Ulta's reasons for her termination were pretextual or find that termination was related to her age.

## IV.     Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted, and Plaintiff's claims will be dismissed.  An appropriate order follows.


   /s/ Gerald Austin McHugh
United States District Judge